KEN NOWLIN,                                                    PETITIONER

v.                                                    No. 3:07CR108-MPM-SAA

UNITED STATES OF AMERICA                                      RESPONDENTS

## MEMORANDUM OPINION

This matter comes before the court on the petition [127], [129] by Ken Nowlin for a writ of error *coram nobis*. The government has responded to the petition; the petitioner has replied, and the matter is ripe for resolution. For the reasons set forth below, the instant petition [127], [129] for a writ of error *coram nobis* will be denied.

### Facts and Procedural Posture

Ken Nowlin and Gary Massey were indicted by the Grand Jury for the Northern District of Mississippi in a 41-count indictment on 31 May 2007. Pursuant to a plea agreement with the government, Nowlin testified before the Federal Grand Jury for the Northern District of Mississippi on 28 June 2007. A superseding indictment was returned that same day, charging both Massey and Nowlin in 53 counts. On 27 July 2007, Nowlin pled guilty to Count One of the superseding indictment and agreed to continue his cooperation with the government. Nowlin and his attorney Anthony L. Farese met several times with government prosecutors and agents and Nowlin was prepared to testify at trial against Gary Massey.

At the time of his indictment, Nowlin had been in the insurance business for almost three decades. Grand Jury Transcript, p. 4. He specialized in brokering health care plans to various companies and governmental entities. He had 60 or 70 local agents who brokered their clients' health care plans through him – with the agent receiving an 8% commission from the insurance company in

addition to a 4% "override" that the insurance company paid to Nowlin.  Grand Jury Transcript, p. 5-6.

Gary Massey was one of those agents.  In 1994 or 1995, Gary Massey sold Lafayette County,

Mississippi its health care plan, receiving two-thirds (2/3) of the 12% commission on that plan.

Massey received 8% of the face amount of the premium, and Nowlin received 4%.  Grand Jury

Transcript, p. 7.  Massey was then elected to the Lafayette County Board of Supervisors in 1994; he

took office in January 1995.  The month before Massey took office, Nowlin and Massey discussed the

fact that Massey could not sit on the Board and receive commissions as the agent for the county's

health insurance coverage.  Grand Jury Transcript, p. 8.  Massey's portion of the commission on the

Lafayette County plan was at that time about $11,000 per month, and the commissions Massey and

Nowlin shared over the period of time from January 1996 until the county placed its coverage with

another company in 2004 totaled about $827,000. Grand Jury Transcript, p. 19.  Massey and Nowlin

then agreed that Massey would continue to receive money equal to his commission, but they would

call it a "consulting fee" since he could not receive the commission directly.  Nowlin would become

the sole agent of record on the Lafayette County plan, and Massey would receive his 8% commission

from Nowlin, rather than from Trustmark, the insurance company.  Grand Jury Transcript, p. 8.

Nowlin made this clear when testifying before the Federal Grand Jury:

> AUSA Tom Dawson:  Now the reason that Massey wanted to no longer be the agent of record is that he knew that, as the supervisor, he could not share any commissions from the contract of the county in which he serves on the Board?
>
> NOWLIN:  That's right.
>
> DAWSON:  Of course, you knew that as well?
>
> NOWLIN:  Yes, sir.

Grand Jury Transcript, p. 9.  Nowlin agreed to replace Massey's commission check from the insurance company with an equal check written on his own business account each month.  When asked if he would have paid Massey the "consulting fee" had it not been for the Lafayette County plan, Nowlin responded under oath that he would not have done so.  Grand Jury Transcript, p. 10.  Indeed, Massey made clear that the money he received was simply a commission when he demanded a $3,000 per month increase in the "consulting fee" to match his share of an increase in the Lafayette County health insurance plan's premium.  Grand Jury Transcript, pp. 12-16.  Nowlin testified under oath before the federal grand jury that he increased Massey's "consulting fee" approximately $3,000 per month because Massey threatened to take away the Lafayette County business – and other business – if he did not.  Grand Jury Transcript, p. 15.  By the time Massey made his heated demand for more money to match the higher premiums, anyone would have understood:  Massey was threatening to take the Lafayette County health care contract as well as others and move them to a different company.  Nowlin stood to lose his 4% override on the Lafayette County plan, as well as several other plans.  Grand Jury Transcript, p. 16.

Nowlin and Massey made approximately $827,000 in commissions between January 1996 and mid-2004, when the contract was not renewed by the Lafayette County Board of Supervisors.  Grand Jury Transcript, p. 19.  Massey had a clear conflict of interest – to keep the plan for Lafayette County because it made a great deal of money for Gary Massey and Ken Nowlin.  They concealed the scheme to make it work.

Nowlin initially contended, however, that he believed the payment arrangement to be legal because Massey claimed to have a legal opinion telling him so.  To test this contention, Tony Farese, Nowlin's defense attorney, arranged for his client take an FBI polygraph to see if he honestly believed

that Gary Massey had permission to receive his commission by simply calling it a consulting fee.  The polygrapher found Nowlin to be deceptive when he answered "no" to the question:  "Did you and Gary discuss how to hide the Total Plan Service commission?"  At that point, Tony Farese clearly recognized that the race to the courthouse had begun, and if his client wanted to win that race – and negotiate the best deal (including a downward departure under § 5K1.1) – he needed to make a plea deal first.  At Farese's urging, Nowlin signed a plea agreement, cooperated with the government, testified in the grand jury about the criminal conspiracy, and pled guilty a month before Massey.  The government filed a § 5K1.1 motion for downward departure in recognition of Nowlin's cooperation.

Nowlin's case was going as smoothly as one could hope under the circumstances – until he deviated from the advice of his attorney.  Prior to sentencing, Nowlin had – over and over – admitted that he was guilty of the crime charged in Count One of the superseding indictment.  He had unequivocally admitted guilt:  to the government in several Fed. R. Crim. P. 11 meetings, in his plea agreement, during testimony before the Grand Jury, at his change of plea hearing, and on multiple occasions to his attorney.  However, for some reason, shortly before sentencing, at a meeting with defense counsel, he changed his mind and began to assert his innocence, arguing once again that his co-defendant, Gary Massey, had misled him regarding the legality of the arrangement to pay Massey the commissions relabeled as "consulting fees."  At the meeting, counsel – in the strongest terms possible – warned Nowlin of the many negative consequences of attempting to change his plea after admitting guilt so many times.  Counsel memorialized the conversation in a lengthy, strongly-worded letter.  (defense Exh. 22).  Nowlin responded in an October 3, 2007, letter, stating that "After much thought and careful consideration, I do not wish to change my guilty plea or my plea agreement . . . ."

As Larry Nowlin (Ken's brother) said in his affidavit (defense Exh. 11), "Ken tried to tell Judge Mills he was not guilty because there were mitigating circumstances. Ken told Judge Mills that he was misled by an elected official (Massey). When Ken said this, Farese pulled on Ken's coat to the extent that it indicat[e]d to me and everyone in the courtroom that Farese was trying to get Ken to shut up." These statements before the court undermined Nowlin's acceptance of responsibility. The court then sentenced him to the upper end of the guidelines range despite the government's § 5K1.1 motion. Nowlin ended Mr. Farese's representation and obtained other counsel to prosecute his appeal, attacking the 30-month sentence as unreasonable. The Fifth Circuit Court of Appeals affirmed the judgment. He then filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, which the court denied. The court also denied Nowlin's motion to reconsider its decision to deny § 2255 relief. Nowlin then filed the instant petition for a writ of error *coram nobis*.

### *Coram Nobis* Relief[1]

The term *coram nobis*, a vehicle to mount a post-conviction collateral challenge to a judgment, is of Latin origin, and literally means "in our presence" or "before us." *Black's Law Dictionary*, 304-305 (5th ed. 1979). The "us" in the translation refers to the court which rendered the challenged judgment. *Id.* The purpose of the writ is to present to the court – and obtain relief from:

> errors of fact, such as a valid defense existing in the facts of [the] case, but which, without negligence on [the] defendant's part, was not made, either through duress or fraud or excusable mistake, where [the] facts did not appear on [the] face of [the] record, and were such as, if known in season, would have prevented rendition of the judgment.

---

[1] The court obtained the bulk of the information and authority for this discussion of *coram nobis* relief from the *Federal Postconviction Remedies and Relief Handbook* § 2:20 (Donald E. Wilkes, Jr.), an invaluable resource for studying this seldom-used vehicle for post-conviction relief.

*Id.* The All Writs Act, 28 U.S.C. § 1651, authorizes federal *coram nobis* relief, an extraordinary postconviction remedy for those convicted in a federal district court or a federal military tribunal. *Federal Postconviction Remedies and Relief Handbook* § 2:20 (Donald E. Wilkes, Jr.) *Coram nobis* applies only to federal convictions – and may not be used to challenge convictions in state court. *United States v. Poole*, 531 F.3d 263 (4th Cir. 2008); *Ogunwomoju v. United States*, 512 F.3d 69 (2[d] Cir. 2008) (a federal district court has no jurisdiction to issue writs of error *coram nobis* to set aside a state court judgment). A defendant seeking *coram nobis* must do so by filing the petition in the convicting court as part of the original criminal proceeding.[2]

The federal *coram nobis* remedy "is of the same general character as one under 28 U.S.C. § 2255" with substantially the same grounds for relief – the ground for relief must involve fundamental error, whether jurisdictional, constitutional, or otherwise. *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247 (1954). A *coram nobis* proceeding under 28 U.S.C.A. § 1651 is not a civil action; it is, instead, a post-sentencing phase of the original criminal prosecution giving rise to the challenged conviction. *United States v. Denedo*, 129 S. Ct. 2213, 2221, 173 L. Ed. 2d 1235 (2009); *United States v. Morgan*, 346 U.S. 502, 506 n.4, 74 S. Ct. 247, 98 L. Ed. 248 (1954). The convicted defendant need not be in custody when seeking federal *coram nobis* relief. *Barreto-Barreto v. United States*, 551 F.3d 95 (1st Cir. 2008). In fact, as *coram nobis* relief is barred when another remedy is available, a defendant in custody through a federal conviction must proceed under 28 U.S.C.A. § 2255, rather than 28 U.S.C.A. § 1651. *Jimenez v. Trominski*, 91 F.3d 767 (5th Cir. 1996), *United States v. Marcello*, 876 F.2d 1147 (5th Cir. 1989). For this reason, defendants convicted in federal district court seeking relief

---

[2] In cases involving a conviction in a military tribunal, however, the application for *coram nobis* relief must be filed, not in the convicting court, but in the appellate military tribunal.

under § 1651 are almost exclusively those who received a sentence not involving incarceration – or who have been sentenced to a term in prison but have completed it. Thus, *coram nobis* relief is substantially equivalent to that under 28 U.S.C. § 2255, but without a custody requirement. *Federal Postconviction Remedies and Relief Handbook* § 2:20 (Donald E. Wilkes, Jr.)

However, unlike a Section 2255 proceeding, in a federal *coram nobis* proceeding, the person receiving relief must not only show that the conviction or sentence is invalid, he must also prove he is suffering adverse collateral consequences resulting from the conviction. *United States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954). Examples of adverse collateral consequences include: Receiving recidivist punishment arising out of a subsequent conviction, threat of deportation, or suffering a loss of civil rights. *Postconviction Remedies and Relief Handbook, supra*. Rule 60(b) of the Federal Rules of Criminal Procedure does away with the writ of error *coram nobis* only with respect to attacks on federal *civil* judgments; it does not affect the availability of *coram nobis* to attack federal *criminal* judgments. *Id*.

Only two U.S. Supreme Court decisions involve federal *coram nobis* post-conviction relief: *United States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954), and *United States v. Denedo*, 129 S. Ct. 2213, 173 L. Ed. 2d 1235 (2009). Thus, the lower federal courts have been left to define the contours of *coram nobis* relief. The various federal courts of appeals have rendered conflicting opinions as to the requirements for obtaining *coram nobis* relief; as such, its methods of application vary among the circuits. *Postconviction Remedies and Relief Handbook, supra*. However, the remedy is generally available to a defendant if: (1) the ground for relief involves fundamental error; (2) no other judicial remedy, such as relief under 28 U.S.C. § 2255, is currently available; (3) the defendant can show valid reasons for failing to seek relief earlier; and (4) as a result of the conviction,

the convicted person is suffering or threatened with adverse collateral consequences. *Id.* The requirement regarding adverse collateral consequences when seeking *coram nobis* reflief cannot be satisfied merely because the defendant, as a result of the conviction, (1) suffers damage to his reputation, (2) experiences difficulty acquiring or keeping a job, (3) suffers monetary loss, or (4) suffers spiritually. *Id.* Those convicted of misdemeanors may also seek *coram nobis* relief. *United States v. Walgren*, 885 F.2d 1417 (9th Cir. 1989); *Hirabayashi v. United States*, 828 F.2d 591 (9th Cir. 1987).

Should the defendant prevail in a *coram nobis* proceeding, the court usually provides relief in the form of the vacatur and setting aside of the invalid conviction. *Allen v. United States*, 867 F.2d 969 (6th Cir. 1989). Courts have also provided relief by requiring reimbursement of restitution paid by the defendant. *United States v. Mischler*, 787 F.2d 240 (7th Cir. 1986). The court may also order repayment of a fine exacted as a result of the invalidated conviction. *See, e.g., United States v. Mandel*, 862 F.2d 1067 (4th Cir. 1988). The defendant may appeal an adverse ruling on a petition for a writ of error *coram nobis*, as may the government. *Howard v. United States*, 962 F.2d 651 (7th Cir. 1992) (defendant may appeal), *Nicks v. United States*, 955 F.2d 161 (2[d] Cir. 1992) (government may appeal).

## Continuing Adverse Consequences

The government argues that Nowlin has not alleged any adverse consequences as a result of his conviction in this case. *See United States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954). In response, Nowlin alleges a variety of civil disabilities, including: (1) loss of insurance license, (2) loss of insurance business, (3) loss of position as board member of a bank, (4) loss of right to possess a firearm, (5) loss of right to vote, and (6) loss of $500,000 in bonuses (which are non-transferrable) as of the time of his conviction. He also alleged several other losses of a personal

- 8 -

nature.  Examples of adverse collateral consequences sufficient to support *coram nobis* relief include: receiving recidivist punishment arising out of a subsequent conviction, threat of deportation, or suffering a loss of civil rights.  *Postconviction Remedies and Relief Handbook, supra.*  On the other hand, the adverse collateral consequences requirement to obtain *coram nobis* relief is not satisfied simply because the convicted person, as a result of the conviction, (1) is suffering damage to his reputation, (2) is experiencing employment difficulties, (3) is suffering monetary or financial losses, or (4) is undergoing spiritual suffering.  As Nowlin has alleged loss of his Second Amendment right to keep and bear arms, as well as his right to vote, he has shown sufficient adverse consequences (loss of civil rights) to support the instant petition for a writ of *coram nobis.*

## Ken Nowlin is Not Entitled to *Coram Nobis* Relief

As set forth above, a criminal defendant may make use of *coram nobis* as a vehicle to challenge his conviction if:  (1) the ground for relief involves fundamental error; (2) no other judicial remedy, such as relief under 28 U.S.C. § 2255, is currently available; (3) the defendant can show valid reasons for failing to seek relief earlier; and (4) as a result of the conviction, the convicted person is suffering or threatened with adverse collateral consequences.  Clearly, if the court had proceeded in the absence of subject matter jurisdiction, then it would have made a fundamental error.  In addition, as Nowlin has been released – and has not succeeded in his pursuit of relief under 28 U.S.C. § 2255, *coram nobis* is the only judicial remedy available.  Nowlin has not, however, shown why he did not seek relief earlier.  In his reply in support of his *coram nobis* petition, though, he has stated sufficient adverse consequences arising out of his conviction to sustain a claim for *coram nobis* relief.

Nowlin primarily argues that the court did not have jurisdiction over the subject matter of this case.  Certainly, if true, such an error is fundamental; indeed, any judgment entered in the absence of

jurisdiction is void – and can be challenged by the parties or the court at any time. *MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990). He also argues that the amount of restitution he paid was improperly calculated. As will be discussed below, Nowlin's claim that the court lacked jurisdiction over the subject matter is without merit, and he waived his claim regarding the amount of restitution because he could have raised it earlier in the case and did not do so.

### Elements of Nowlin's Conviction

Nowlin pled guilty to conspiracy (under 18 U.S.C. § 371) to commit federal government program fraud (under 18 U.S.C. § 666(a)(2)). The elements of conspiracy are: (1) that Nowlin and at least one other person (Gary Massey), (2) agreed to commit the crime of corruptly accepting something of value (monthly health insurance commissions), (3) with the intention of influencing a state public official (Gary Massey, Lafayette County Supervisor), (4) as to the Lafayette County employees plan health insurance contract, (5) that at least one of the conspirators committed an overt act set forth in the indictment, and (6) in order to accomplish the objective of the conspiracy.

The underlying crime was federal programs fraud under 18 U.S.C. § 666(a)(2). The elements of this crime are: (1) an agent (Gary Massey) of a local government (Lafayette County Board of Supervisors), (2) which received Federal program benefits in excess of $10,000 for the one-year period of 2002, (3) aided and abetted by Ken Nowlin, (4) corruptly accepted and agreed to accept, (5) funds in excess of $5,000 (health insurance premiums), (6) so that Massey would be influenced and rewarded, (7) in connection with the business transactions of Lafayette County, Mississippi. The only element establishing federal subject matter jurisdiction is the receipt by Lafayette County, Mississippi of at least $10,000 per year of federal program funds.

Nowlin argues that, in order to establish subject matter jurisdiction as to 18 U.S.C. § 666(a)(2), the government must prove that the federal funds Lafayette County received must have been used, in some way, to pay for health insurance Lafayette County purchased during the relevant time. As discussed below, Nowlin is mistaken in this belief. The government, on the other hand, argues that the court has jurisdiction over the matter because the indictment is based upon 18 U.S.C. § 666(a)(2), which has not been ruled unconstitutional. Though the court holds that it has jurisdiction to review this matter, that holding is – and must be – based upon more than merely the constitutionality of the criminal statute at issue.

## Subject Matter Jurisdiction

Article III, Section 1 of the Constitution states that: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." In Section 2 of Article III, the Founders defined judicial power:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

> In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Eleventh Amendment, ratified in 1795, removes from the judicial power of the United States suits "commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Thus, federal courts are vested with limited subject matter jurisdiction. Most state courts are courts of general jurisdiction, and a state court may presume that it has subject matter jurisdiction over any controversy before it – unless a party can show otherwise. Wright & Miller, 13 Fed. Prac. & Proc. Juris. § 3521 (3d ed.) The federal courts, however, have power to hear only those cases (1) that are within the judicial power of the United States – as set forth in the Constitution, or (2) that Congress has granted to the Courts. *Kontrick v. Ryan*, 540 U.S. 443, 454, 124 S. Ct. 906, 915, 157 L. Ed. 2d 867 (2004).

"The requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93, 118 S. Ct. 1003, 1012, 140 L. Ed. 2d 210 (1998), *quoting Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 4 S. Ct. 510, 28 L. Ed. 462 (1884). Indeed, "the issue concerns the fundamental constitutional question of the allocation of judicial power between the federal and state governments." Wright & Miller, 13 Fed. Prac. & Proc. Juris. § 3521 (3d ed.), *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 574-576, 124 S.Ct. 1920, 1926-1927 (2004). A federal court must presume that it does *not* have subject matter jurisdiction, and the party seeking to invoke jurisdiction must affirmatively allege facts to support it. *Vaden v. Discover Bank*, 129 S. Ct. 1262, 1277-1278, 173 L. Ed. 2d 206 (2009). Indeed, in the face of a challenge to the facts supporting subject matter jurisdiction, the burden of proof falls on the party claiming jurisdiction, and the showing must be made by a preponderance of the evidence. *McNutt v.*

*General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 56 S.Ct. 780 (1936) (must allege facts supporting subject matter jurisdiction), *Vantage Trailers v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009) (must show subject matter jurisdiction by preponderance of evidence).

Courts must examine two facets of subject matter jurisdiction:  (1) whether the *allegations* are sufficient to support a finding of subject matter jurisdiction (facial validity), and (2) whether the *facts* supporting subject matter jurisdiction are accurate (factual validity).  When faced with a factual challenge to jurisdiction over the subject matter, the court may move beyond the allegations of the complaint and consider relevant evidence – including affidavits and testimony.  *Id.*

> Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. A *facial* attack is a challenge to the sufficiency of the pleading itself. On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party. A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.

*Nichols v. All Points Transport Corp. of Michigan, Inc.*, 364 F. Supp. 2d 621, 627 (E.D. Mich. 2005), *quoting U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994), cert. denied, 513 U.S. 868, 115 S. Ct. 188, 130 L. Ed. 2d 121 (1994) (emphasis original; citations omitted).  The parties do not contest the facial validity of § 666; as such, it is the *factual validity* of § 666 that the court must consider in the present case.

### Discussion

The parties agree on the facts relevant to the issues in the instant petition for a writ of error *coram nobis*.  They disagree, however, as to the import of those facts.  As discussed below, the two most important facts regarding subject matter jurisdiction are:  (1) that Lafayette County, Mississippi

(the "agency") received more than $10,000 per year in federal program funds for each year in

question, and (2) that there was a "nexus" between Nowlin and Massey's *criminal conduct* and the

*agency*, Lafayette County, Mississippi.  These two facts – together – establish subject matter

jurisdiction in this case.

### United States v. Whitfield

Nowlin looks to *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009) to support his

argument that the court lacked subject matter jurisdiction over the allegations of federal program

bribery under 18 U.S.C. § 666(a)(2).  In *Whitfield*, attorney Paul Minor was charged with a variety of

racketeering and corruption offenses, including federal program bribery under 18 U.S.C. § 666.

*Whitfield*, 590 F.3d at 342.  Minor had guaranteed loans for two Mississippi state judges to assist in

their election campaigns.  *Id.* at 336, 339-340.  Minor, himself, eventually repaid almost all of the loan

money.  *Id.* at 337.  Minor ensured that the loans were structured as "balloon notes," which came due

every six months, thus giving him considerable leverage over the two judges.  *Id.* at 337, 339.  In two

separate cases, the judge with the loan (which Minor had guaranteed) made extremely unusual rulings,

circumventing normal court procedure (of randomly assigning judges to a case) to ensure that he was

assigned to Minor's case.  *Id.* at 337, 340.  In one of the cases, which involved personal injury, Minor

requested a bench trial, even though most attorneys would prefer to put such a case before a jury.  *Id.*

at 337.  In the other case, Minor even filed a complex insurance coverage matter in Mississippi

Chancery Court – a court which usually handles matters of family law, real estate, and issues

involving minor children.  *Id.* at 339-340.  As any Mississippi lawyer would know, and another judge

who handled part of the case confirmed, filing such a case in Chancery Court is all but unheard-of –

and "very unusual."  *Id.* at 340.  As each tainted case moved forward, the judges made unusually

generous rulings in favor of Minor's clients and extremely detrimental to the defendants. *Id.* at 337-338, 339-341. In the first case (the bench trial), the judge Minor selected awarded the plaintiff $3.75 million in damages.[3] *Id.* at 337-338. In the other case, after settlement conferences (with the judge serving as mediator) failed to bring the parties to agreement, the judge Minor had selected made an "announcement": that he was offended by the defendants' conduct and, in his determination, $1.5 million (five times actual damages) was an appropriate settlement figure. *Id.* at 341. Given the bizarre nature of the proceedings up to that point, and fearing an even worse outcome at trial, the defendant agreed to the $1.5 million settlement figure. *Id.*

Only the convictions obtained against Minor under 18 U.S.C. § 666 are relevant to the instant case. As did Paul Minor, Nowlin has mounted a *factual challenge* to the government's claim that the court had subject matter jurisdiction to rule on his conviction for federal program bribery under 18 U.S.C. § 666(a)(2). That statute, entitled "Theft or bribery concerning programs receiving federal funds," provides in relevant part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists—
>
> > (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
> >
> > . . .
> >
> > (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded *in connection with any business, transaction, or series of transactions* of such organization, government, or agency involving any thing of value of $5,000 or

---

[3] The trial judge then reduced the award to $3.64 million. On appeal the Mississippi Supreme Court reduced that award to $1.64 million. Then, after the indictment and jury verdict in *Whitfield*, the Mississippi Supreme Court granted the defendant's motion for rehearing, withdrew its original judgment, and remanded the case for a trial on all issues.

more; or

>> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, *in connection with any business, transaction, or series of transactions* of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(a)-(b) (emphasis added).

The government's § 666 claims against Minor were based upon federal program money given to Mississippi's Administrative Office of the Courts ("AOC"). The AOC is a Mississippi state agency charged with "assist[ing] in the efficient administration of the *nonjudicial* business of the courts of the state." Miss. Code Ann. § 9-21-1 (1972) (emphasis added). The federal funds provided to the AOC were associated with programs related to: (1) improving state youth courts, (2) studying juvenile defense, (3) collecting information on cases involving aliens, and (4) installing modern display systems in courtrooms. The government argued that the two judges under Minor's influence were "agents" of the AOC, and the jury returned its guilty verdict based upon that theory. The government's theory was, however, flawed, as the AOC operated independently from the judiciary itself, and there was no "nexus" between the *criminal conduct* (taking bribes and issuing tainted orders) and the *agency* receiving federal funds (the AOC). *United States v. Whitfield*, 590 F.3d 325, 345 (5th Cir. 2009), *citing United States v. Moeller*, 987 F.2d 1134, 1137 (5th Cir. 1993).

The requirement of such a nexus cannot be found in the text of § 666; however, the nexus must exist to establish jurisdiction over the subject matter of the case. The Fifth Circuit recognizes

that Congress established subject matter jurisdiction in § 666 cases: "*Congress* has cast a broad net to encompass local officials who may administer federal funds . . . ." *United States v. Westmoreland*, 841 F.2d 572 (5th Cir. 1988), *cert. denied,* 488 U.S. 820, 109 S.Ct. 62 (1991). Indeed, the jurisdictional net is broad enough that, for the court to entertain a charge under § 666, "[t]he particular program involved in the theft or bribery need not be the recipient of federal funds." *United States v. Little*, 889 F.2d 1367, 1369 (5th Cir. 1989). The Fifth Circuit, however, held that there are limits to the scope of subject matter jurisdiction under § 666, holding that, "[a]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, *there must be some nexus between the criminal conduct and the agency receiving federal funds*." *Moeller*, 987 F.2d at 1137 (5th Cir. 1993) (emphasis added). Thus, to establish initially that a federal court may exercise subject matter jurisdiction over a § 666 case, the government must *allege* facts sufficient to show such a nexus between the criminal conduct and the agency. *Id.* In a case where a defendant *challenges* subject matter jurisdiction, the government must present *proof,* by a preponderance of the evidence, to support the claim of jurisdiction. *Vantage Trailers v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).

The government could not do so in *Whitfield*, as the acts of the judges under Minor's influence (various rulings in cases and findings in settlement conferences) were *judicial* in nature, while the AOC itself dealt only with *non-judicial* matters (provision of supplies, support personnel, etc.) *Whitfield*, 590 F.3d at 346, Miss. Code Ann. § 9-21-1 (1972). Thus, even if the court were to find that the judges were agents of the AOC, their role with the AOC "had nothing to do with their capacity as judicial decisionmakers," and, as such, had no "connection with any business, transaction, or series of transactions" of the AOC. *Whitfield,* 590 F.3d at 346. In the absence of such a connection – or nexus – the Fifth Circuit vacated all of the convictions based upon 18 U.S.C. § 666.

### Jurisdiction in the Instant Case

As stated above, the government argued only in support of the *facial* validity of the court's subject matter jurisdiction under 18 U.S.C. § 666 – and did not address Nowlin's *factual* attack. In its brief the government posited, "Jurisdiction is the power of a court over the parties and subject matter before it; *Whitfield* did not hold § 666 unconstitutional, so clearly this court has jurisdiction over § 666 cases." p. 8, Government's response [131] to the instant petition for a writ of error *coram nobis*. Under the government's theory of the case, Nowlin has not even identified a fundamental right at issue, thus precluding *coram nobis* relief. Nowlin, on the other hand, argued that the assertion of subject matter jurisdiction was *factually* invalid. While a federal court may entertain cases filed under § 666, it may do so only when the facts alleged and (if challenged) proven, support a finding of subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 56 S.Ct. 780 (1936). The facial validity of 18 U.S.C. § 666 is not at issue. However, as Nowlin has mounted a factual challenge to subject matter jurisdiction, he has identified a fundamental right, and the court will address the merits of his claims.

The gravamen of Nowlin's argument is that, under *Whitfield, supra,* the government's failure to link *his conduct* to *the federal funds* received by the Lafayette County Board of Supervisors is fatal to the court's exercise of subject matter jurisdiction. Fifth Circuit precedent, including *Whitfield*, precludes Nowlin's argument, as the nexus to establish subject matter jurisdiction must be between *his conduct* and *the agency* receiving federal funds, not his conduct and the funds, themselves. *Whitfield*, 590 F.3d at 345, *citing Moeller*, 987 F.2d at 1137. There are many reasons for taking a broader view of § 666 in this regard, which the Supreme Court has summarized succinctly:

Money is fungible, bribed officials are untrustworthy stewards of federal funds, and

> corrupt contractors do not deliver dollar-for-dollar value.  Liquidity is not a financial
> term for nothing; money can be drained off here because a federal grant is pouring in
> there.

*Sabri v. United States*, 541 U.S. 600, 606, 124 S.Ct. 1941, 1946 (2004).  The federal funds went to

Lafayette County, the agency.  Nowlin's *conduct* was selling employee health insurance coverage to

Lafayette County, *the agency*, and sending the premiums to Gary Massey (a member of the Lafayette

County Board of Supervisors) in contravention of Mississippi law.  There could hardly be a clearer

nexus (a business transaction) between Nowlin's conduct and Lafayette County, Mississippi; as such,

the court had subject matter jurisdiction to hear the case.  This ground for relief is without merit and

will be denied.

### Restitution

Nowlin also argues that the court ordered him to pay more in restitution than the financial

harm Lafayette County suffered.  Though payment of excessive restitution can be a ground for *coram*

*nobis* relief, *United States v. Mischler*, 787 F.2d 240 (7th Cir. 1986), such relief is not warranted in the

present case.  A convicted defendant has the right to be sentenced based upon accurate information.

*United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591 (1972).  In *Mischler*, the district court

found that the defendants, Paul and Carol Mischler, who were convicted for Medicare fraud, should

pay approximately $216,000 in restitution to Medicare.  *Mischler*, 787 F.2d at 243-244 (7th Cir. 1986).

The Mischlers had objected to the amount of restitution during the change of plea hearing and the

sentencing hearing, and even the government conceded during oral argument that the calculation was

"grossly inaccurate."  *Id*. at 246.  Counsel for the Mischlers repeatedly objected to the calculation, and

they never acquiesced in the government's figure.  *Id*.

The Seventh Circuit Court of Appeals held that the district court: (1) relied on inaccurate information, (2) did not determine the amount of damages with certainty, and (3) did not provide the defendants with adequate opportunity to be heard on the question of amount of actual loss. *Id*. at 247. For these reasons, the Seventh Circuit granted the Mischler's petition for writ of error *coram nobis*, and remanded the case to the district court.

The instant case is easily distinguishable from *Mischler*. First, Nowlin pled guilty and agreed to the total amount of loss that Lafayette County suffered, though he argued during his change of plea hearing that he should be responsible for restitution only as to the amount of loss attributable directly to him – approximately $275,000. Change of Plea Transcript, p. 20. The court agreed with Nowlin's argument and required restitution of only that amount. The court has found no other objections made on Nowlin's behalf as to the issue of restitution. Further, Nowlin has not argued that the information the court relied upon to calculate the amount of loss was inaccurate, as he, himself, provided the information and explained the operation of his business to government prosecutors and investigators. Certainly Nowlin has had adequate opportunity to urge his present position regarding the amount of restitution, as he could have done so at his change of plea hearing, his sentencing hearing, in objections to the Presentence Investigation Report, or at any time through a motion. He chose not to, and he is thus precluded from raising the issue in the present case.

Nowlin's claim regarding the *certainty* of the calculation of restitution (found largely in the exhibits to his reply in support of his *coram nobis* petition) is more interesting. Nowlin now argues that, in calculating the county's total loss, the court should not have simply added together the payments of commissions and overrides to Nowlin and Massey – because the county would have paid commissions and overrides to *someone*, no matter which agent, broker, or company it decided to use.

Nowlin argues that the court should, instead, have had the parties determine the difference, if any, in the commissions and overrides paid to Nowlin and Massey – and the commissions and overrides that would have been paid, had the county chosen to purchase insurance through another agent or broker. Nowlin provides documents tending to show that Lafayette County would have kept its health insurance through Trustmark, despite the high premiums, because – as a "Cadillac plan" – the insurance policy paid 90% of covered medical claims, leaving only 10% out-of-pocket for the policyholders. The Trustmark policies also had extremely low copays on doctor visits and medications. The documents also show that Lafayette County was reluctant to move to a different insurer because, at the time, some Lafayette County employees and family members had become gravely ill and incurred medical costs exceeding $1 million. As such, it was unlikely that another company would provide health insurance with such generous coverage. If the court were to use Nowlin's present analysis, it appears that Lafayette County might have suffered very little pecuniary loss – or none at all.

As the Seventh Circuit made clear in *Mischler*, for a defendant to afford himself of the venerable writ of error *coram nobis*, he must have raised the alleged error at some point earlier in the proceedings. *United States v. Mischler*, 787 F.2d 240 (7th Cir. 1986), *see also Glinsey v. United States*, 345 Fed.Appx. 914 (5th Cir. 2009) (denying *coram nobis* relief because defendant failed to raise the claim earlier in proceedings), *Calvert v. United States*, 351 Fed.Appx. 475 (2d Cir. 2009). The error Nowlin alleges is one of mathematics – and of such a nature that a longtime businessman in the insurance industry should easily have recognized and brought it before the court prior to imposition of judgment. He did not do so; as such, he has waived this issue.

**Conclusion**

In sum, for the reasons set forth above, the instant petition for a writ of error *coram nobis* will be denied.  A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 29th day of January, 2015.

/s/ **MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**